HOOD, Judge.
Plaintiff, J. B. Hanchey, sues for damages for personal injuries allegedly sustained by him when he' received an electrical shock. The suit was instituted against Central Louisiana Electric Company, Inc., and its insurer, Continental Casualty Company, and against Samuel E. Lack and his insurer, Hartford Accident & Indemnity Company. Judgment on the merits was rendered by the trial court in favor of defendants. Plaintiff has appealed.
Plaintiff Hanchey is the owner and operator of an automobile repair shop or garage which is located behind his residence, in DeRidder, Louisiana. He received an electrical shock on March IS, 1966, while in that garage and while he was handling and preparing to use an electric worm digger. The shock caused him to fall or to be thrown to the floor of the building and then to the ground outside of that structure. He contends that as a result of that fall he sustained injuries to his back, hip and leg.
The “worm digger” had been purchased by plaintiff about 20 years before the accident occurred. It consisted of a metal rod, about 24 to 30 inches long, fitted on one end with a plastic handle. The other end of the rod was pointed, and about three or four inches from this point there was soldered to the rod one end of a 25 foot long single strand of insulated wire. Attached to the other end of this wire was a two pronged plug, which allowed the device to be plugged into a standard 110-120 volt electrical outlet. The single strand of wire was attached to only one of the two prongs in the plug. Unlike the usual two-wire electric cord, there was no “ground” or “neutral” wire in this particular cord. *401 When the device was properly plugged into an ordinary outlet this wire made contact with the “hot line” in the outlet, and the electrical current was transmitted through that wire from the outlet to the worm digger. If the plug should be reversed and inserted into the outlet in such a way that the single strand of wire made contact only with the ground or neutral side of the outlet, then ordinarily no electricity would flow through the wire to the worm digger.
The device was operated by plugging the cord into an electrical outlet in such manner that the single strand of wire made contact with the “hot line,” and then sticking the sharp end of the rod into the ground. If properly plugged into the outlet, an electrical current would then flow from the rod into the earth, causing worms to come to the surface.
On the above mentioned date plaintiff placed the “shocking device” on the concrete floor of his repair shop, near one of the exit doors, and he plugged the single wire cord into a 110-120 volt outlet located in the building. He testified that he then reached down and put his right hand around the plastic handle of the device and at that time he received an electrical shock which caused him to catapult through the exit door of the building and into the yard. While he was in the yard, attempting to disengage himself from the worm digger, the point of the rod struck the metal building, thus breaking the current and allowing him to separate himself from that device.
Plaintiff alleges that he does not know the exact cause of the accident, but that defendants know or should know the cause. He contends that the instrumentality which caused it was under the control of defendant, Central Louisiana Electric Company, that the accident was of a kind that does not ordinarily occur in the absence of negligence, and that he thus is entitled to invoke the doctrine of “res ipsa loquitur.”
The doctrine of “res ipsa loqui-tur” is a rule of evidence peculiar to the law of negligence, and it is an exception to the general rule that negligence must be affirmatively proved by the party who alleges it. When an accident occurs causing injury, without fault on the part of the 'injured party, and it is shown that the instrumentality which caused the accident was under the control of defendant and that the accident was such as would not have occurred ordinarily if the one having control uses proper care, then the injury is presumed to have been caused by the defendant’s negligence, and the burden of proof is shifted to the defendant to exculpate himself from fault. Northwestern Mutual Fire Association v. Allain, 226 La. 788, 77 So.2d 395, 49 A.L.R.2d 362 (1954); Great American Indemnity Company v. Ford, 122 So.2d 111 (La.App.2d Cir. 1960); Talbert v. Tyler, 121 So.2d 854 (La.App. 2d Cir. 1960) ; Tassin v. Louisiana Power & Light Company, 250 La. 1016, 201 So.2d 275 (1967); Pilie v. National Food Stores of Louisiana, 245 La. 276, 158 So.2d 162 (1963).
In order for this rule of evidence to be invoked, and for the burden of proof thus to be shifted to defendant, the evidence must establish the “thing” that caused the injury. • The rule cannot be applied where the thing which caused the injury is unknown, or is not established by the evidence. Talbert v. Tyler, supra; Shields v. United Gas Pipe Line Company, 110 So. 2d 881 (La.App.2d Cir. 1959).
The doctrine of res ipsa loquitur may be invoked only where the evidence warrants an inference that it was the defendant’s negligence, rather than the acts of others for which defendant is not responsible, that caused the accident. It may not be invoked where, from the nature of the facts established by the record, it could reasonably be concluded that the accident was caused by the negligence of another or through the instrumentality or agency of another. Pilie v. National Food Stores of Louisiana, supra; Talbert v. Tyler, supra; James v. Childs, Division of Kroger Company, 166 So.2d 77 (La.App. 3d Cir. 1964); *402 Larkin v. State Farm Mutual Automobile Insurance Company, 233 La. 544, 97 So.2d 389 (1957); Morales v. Employers’ Liability Assurance Corp., 202 La. 755, 12 So. 2d 804 (1943).
Plaintiff takes the position that the “thing” which caused the accident was an abnormal surge of high voltage electricity into the electrical system of his garage, and thus into the worm digger as he was handling it. He contends that he sustained the electric shock because of this alleged surge of power through the line, that the distribution of electrical current is under the control of the defendant electric company, that a surge of high voltage electricity through the line does not ordinarily occur if the one having control exercises ordinary care, that the burden of proof thus rests on defendant to exculpate itself from fault, and that the defendants have failed to sustain this burden of proof.
The evidence shows that over a period of about 15 years plaintiff had complained to the electric company on several occasions that he was having trouble with his electricity. Representatives of the defendant company checked plaintiff’s premises several times as these complaints were received, but they were unable to find any defects in his electrical system or any abnormal flow of electric current into his garage.
About five months after this accident occurred, the defendant electric company determined that a “hot wire” near an apartment owned by defendant Lack was making contact with the neutral or ground wire of that line, and the result was that an electric current was being transmitted through the neutral or ground wire. The neutral or ground wire, of course, ordinarily carries no current. This discovery was made shortly after a person who was on the Lack premises complained that she had received a shock when she touched a garbage can, and the defect was repaired immediately by cutting the hot line wire at a point near the garbage can on the Lack apartment.
The Lack apartment was located more than 100 feet from plaintiff’s garage. The electrical system in that apartment was installed by the owner, and not by the defendant electric company. The evidence indicates, however, that if a neutral wire on the Lack premises becomes energized by coming in contact with a hot line, such a circumstance could have the effect of causing an electric current also to be transmitted through the neutral or ground line in plaintiff’s garage.
The evidence also shows, however, that the current which was being transmitted into the neutral wire of the Lack apartment in August, 1966, did not, and could not, exceed 120 volts. Actually, a test was made at the time this defect was discovered, five months after the accident, and it showed that from 80 to 90 volts was being transmitted into and through the neutral line.
Only one wire was connected to the worm digger, of course, and the evidence shows that regardless of the way the plug was inserted into the outlet it was impossible for more than 120 volts to be transmitted to the worm digger. Plaintiff, in plugging the wire into the outlet, must have anticipated that 110 to 120 volts of current would be transmitted through the wire to the worm digger. It is immaterial, therefore, that some electrical current may have been transmitted through the neutral line, since the total voltage which could have been transmitted under any circumstances could not have exceeded that which plaintiff expected.
The evidence also shows that if there had been a defect in the defendant’s electrical distribution system sufficient to cause a substantial increase in the voltage which flowed into plaintiff’s garage, then the same defect would have caused the electricity to be cut off from a large section of the city. Nothing of that kind took place at or about the time the accident involved here occurred.
*403 We think the evidence fails to establish that there was a substantial increase in the flow of electric current into the electrical system of plaintiff’s garage at the time of this accident. Plaintiff, therefore, has failed to establish the “thing” which he contends caused the accident, and thus he cannot invoke the doctrine of res ipsa loquitur. Talbert v. Tyler, supra.
Actually, the evidence does not establish that the “neutral” or “ground” side of the line in the electrical system of plaintiff’s garage was energized on the day this accident occurred. It is true that such a condition was found to exist five months later on the Lack property in the same city block, but that does not establish that it ever existed in plaintiff’s electrical system, and certainly it does not prove that it existed in his garage when he sustained the injury complained of here. But, if we assume that the same condition existed in plaintiff’s garage on the date of this accident, we must conclude that that defect was not, and could not have been, a proximate cause of the accident.
The evidence shows that the defect in the Lack system caused a maximum of 120 volts to flow through the “hot line” of that system, and it caused a maximum of 80 or 90 volts to flow through the neutral or ground line of that system. Since plaintiff used only a single wire leading from one of those lines to the worm digger, the wire could deliver not more than 120 volts if it was plugged into the hot line side of the outlet, and it could deliver not more than 80 or 90 volts if it was plugged into the ground side of it. In either event the current which would have flowed to the worm digger would not have been any more than 120 volts, and that is exactly the voltage which he expected to be transmitted to the device.
We think the most plausible explanation as to how the accident occurred is: (1) That the worm digger was defective in that it did not provide adequate insulation to plaintiff as he attempted to handle it; or (2) that plaintiff negligently allowed his hand to come in contact with the metal rod or with an exposed part of the wire which led to that rod after the cord had been plugged into the electrical outlet.
Plaintiff testified that immediately before the accident occurred he attempted to pick up the worm digger by putting his hand around the handle of the device and around some of the wire “because it was still wrapped around there.” He destroyed the worm digger immediately after the accident occurred, so defendants have never had an opportunity to view it and it could not be introduced in evidence. It thus is impossible to determine from the evidence the condition of the handle or of the insulation on the wire at the time the accident occurred. A logical and plausible explanation of the accident, however, is that the condition of the worm digger or the insulation on the wire was such that plaintiff’s hand came in contact with the metal portions of the device and thus received an electrical shock.
Another equally plausible explanation of how the accident occurred, if we assumed that there was no defect in the worm digger, is that plaintiff allowed his hand to touch the exposed steel rod as current was being transmitted to it, thus permitting the current to travel through his body. It is true that in order for plaintiff to sustain a shock it would be necessary for some part of his body to be “grounded.” The metal garage building, the ground, or any material which conducts electricity and is in contact with the building or ground, would form a sufficient neutral connection which, if touched by plaintiff while holding the rod, would cause him to receive a severe shock.
Mr. W. K. Lindsey, a witness, quoted plaintiff as stating after the accident occurred that “he picked up the fish deal and was going to go out and get some fish worms and he hit the side of the building and it knocked him out.” This testimony indicates that a part of plaintiff’s body did touch the metal building while he was hold *404 ing the worm digger. A plausible explanation of the accident, therefore, would be that it was plaintiff’s own negligence, and not the defendant’s, which caused the accident.
Our conclusion is that the evidence does not warrant an inference that it was the defendant electric company’s negligence, rather than the acts of others for which that defendant is not responsible, that caused the accident. The doctrine of res ipsa loquitur, therefore, cannot be invoked.
Plaintiff contends, alternatively, that he has established that the defendant electric company was negligent in failing to maintain its electric lines in a safe condition, and in allowing excessive electric current to be transmitted to plaintiff’s garage. He also contends that the proof shows that defendant Lack was negligent in failing to keep the electrical lines on his premises in a safe condition and in permitting an abnormally high voltage current to be transmitted to plaintiff’s repair shop.
We think the evidence fails to show any negligence on the part of either the electric company or of defendant Lack. If negligence should be attributed to either, however, because of the defect which was later discovered in the electrical wiring on the Lack premises, then our conclusion, for reasons already shown, is that this negligence was not a proximate cause of the accident. We find no error in the judgment of the trial court rejecting plaintiff’s demands.
For the reasons herein assigned, the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiff-appellant.
Affirmed.